**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
**PREPAID VENTURES, LTD., et al.,**

<table>
<tr><td align="center">Plaintiffs,</td><td><u>**REPORT AND**</u><br><u>**RECOMMENDATION**</u></td></tr>
<tr><td align="center">-against-</td><td>**18-CV-2102 (DLI)**</td></tr>
</table>

**PAUL COMPTON, et al.,**

**Defendants.**

---------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

On April 9, 2018, plaintiffs PPV Merchant Solutions, LLC (d/b/a CapX Payments) ("CapX"), PPV Holdings, LLC ("PPV Holdings"), and Prepaid Ventures, Ltd. ("Prepaid Ventures") (collectively, "plaintiffs") commenced this action against defendants Christopher Benson, Paul Compton, Pablo Garcia, and ProfitSTAT, LLC ("ProfitSTAT") (collectively, "defendants"), alleging claims for breach of contract (First and Second Counts), breach of fiduciary duty (Third Count), fraudulent concealment by fiduciary (Fourth Count), constructive fraud in contract (Fifth Count), contract performance interfered with by outsider (Sixth Count), intentional interference with prospective economic advantage (Seventh Count), promissory estoppel (Eighth Count), unjust enrichment (Ninth Count), unfair competition (Tenth Count), and contributory trademark infringement (Thirteenth Count).[1]  Currently pending before this Court, on a referral from the Honorable Dora L. Irizarry (the District Judge to whom this case is assigned), is plaintiffs' motion for default judgment.  See Order (July 29, 2022).  For the

---

[1] The Eleventh and Twelfth Counts are titled "Preliminary Injunction" and "Permanent Injunction," respectively.

reasons that follow, this Court respectfully recommends that plaintiffs' motion be granted in part and denied in part as to liability; that plaintiffs' request for lost profits be denied as unduly speculative; and that the request of CapX for damages in the amounts paid to defendants be denied without prejudice, with leave to submit documentation supporting such payments, along with a supplemental declaration quantifying prejudgment interest on the same.

## FACTUAL BACKGROUND

As its principal business, plaintiff Prepaid Ventures offers several brands of prepaid debit cards that various distribution channels and retail merchant locations market to customers so as to generate income from fees on transactions occurring on the card accounts. Compl. ¶ 15. In late 2016, Prepaid Ventures and PPV Holdings commenced a new line of business in merchant processing, which they operate through a wholly owned subsidiary, CapX. See id. ¶ 16. In furtherance of this new line of business, CapX entered into a Business Services Agreement with defendant ProfitSTAT, on December 10, 2016 (the "Business Services Agreement"). See id. ¶ 17. Compton and Garcia, who are alleged to be owners of ProfitSTAT, see id. ¶ 7, and are specifically identified as "Principals" of ProfitSTAT in the Business Services Agreement, see id. ¶ 18, made certain representations to induce CapX to enter into the Business Services Agreement, including the following: that they had many large independent sales organizations ("ISOs") and merchant relationships that could quickly be brought in to build the business; and that "they had access" to "discount for cash" technology that could be used to apply a discount at checkout for customers paying cash, see id. ¶ 21. Compton and Garcia were expected to provide CapX with "discount for cash" technology and

2

to build a sales team to sell a wide range of products and services and to attract merchants for

CapX services.  See id. ¶ 23.

The Business Services Agreement provided that ProfitSTAT, and its named principals

Compton and Garcia:

> will not, directly or indirectly or through an affiliate:  (a) provide any services
> similar to [defined] Services to anyone other than [CapX] without [CapX's]
> prior written consent, including but not limited to placing or seeking to place, or
> permitting or causing any third party to place or seek to place, prospective
> merchants with anyone other than [CapX], unless [CapX] elects, in its sole
> discretion, not to pursue a relationship with a prospective merchant introduced
> to [CapX] by [ProfitSTAT].

Id. ¶ 26; see Business Services Agreement ¶ 5, DE #87-8 at ECF p. 3.  In addition, the

Business Services Agreement provided that during the term of that agreement, and for a period

of 18 months thereafter, ProfitSTAT, Compton and Garcia would not:

> solicit the business of any client or customer of [CapX], or of any person or
> entity known by [ProfitSTAT, Compton or Garcia] to have been contacted by
> [CapX] as a prospective client or customer of [CapX] within the twelve (12)
> month period immediately prior to the termination of this Agreement, either for
> itself or on behalf of a third party that competes with [CapX][.]

Compl. ¶ 27; see Business Services Agreement ¶ 9, DE #87-8 at ECF p. 5.  In exchange for

the services to be provided pursuant to the Business Services Agreement, CapX agreed to pay

ProfitSTAT a monthly fee and to reimburse the expenses of ProfitSTAT and its principals.

See Compl. ¶ 29; see Business Services Agreement ¶ 2, DE #87-8 at ECF p. 2.

On February 20, 2017, CapX entered into a Consulting Agreement with defendant

Christopher Benson, who was introduced to CapX by Compton and Garcia.  See Compl.

¶¶ 31-32.  The Consulting Agreement, whereby Benson became an ISO and sales recruiter for

CapX, provided that CapX would pay Benson monthly in exchange for bringing merchants and

ISOs to CapX and training new ISOs brought to CapX. See id. ¶¶ 32-33. The Consulting Agreement also provided that Benson would not work for a competing business without prior notice to and approval by CapX. See id. ¶ 34; see also Consulting Agreement ¶ 12, DE #87-9 at ECF p. 4.

Plaintiffs allege that in violation of the Business Services Agreement and Consulting Agreement (collectively, the "Agreements"), Compton, Garcia and Benson worked independently with merchants that were being referred to CapX, as well as with others who were not referred to CapX, without CapX's knowledge or consent. See Compl. ¶¶ 37, 79. Plaintiffs additionally allege that Compton, Garcia and Benson improperly "engag[ed] in efforts to divert [merchants] and their business away from CapX for their own benefit." Id. ¶ 38. For example, before the parties entered into the Business Services Agreement, Compton and Garcia told CapX that they had an "in" with high-end potential clients, such as the Dallas Cowboys, Party City, Hard Rock International, Arnold Palmer Golf, Cash Money Records and Wynn Resorts. See id. ¶ 40. Despite CapX's expenditure of significant time and resources supporting efforts to enter into agreements with those potential clients, CapX "never entered into an agreement" with any of them. See id. ¶¶ 41-42. Regarding the Dallas Cowboys, Compton and Garcia were separately pursuing opportunities with them, to the exclusion of CapX, to provide the exact services previously offered to the Dallas Cowboys by CapX. See id. ¶ 43. Indeed, Compton and Garcia created an entity called StarCap to compete directly with CapX. See id. ¶ 44. In addition, while Compton and Garcia introduced CapX to Sigue Corporation as a potential client for prepaid cards, the two entities "never reached an

4

agreement"; instead, Compton and Garcia brought Sigue to another provider.  See id. ¶¶ 45-47.

Compton, Garcia and Benson introduced CapX to other ISOs, including SecuraBull, which recruits ISOs and brings in merchants.  See id. ¶¶ 48-49.  SecuraBull entered into an ISO agreement with CapX.  See id. ¶ 48.  In violation of the Business Services Agreement, Compton and Garcia, on behalf of ProfitSTAT, entered into a joint venture with SecuraBull, under the name SecuraProfit, LLC.  See id. ¶ 54.

On April 20, 2017, CapX entered into an ISO agreement with MiCamp Solutions, LLC (d/b/a MiCamp Merchant Services) ("MiCamp") that provided for CapX to be paid residuals for merchants placed with MiCamp.  See id. ¶ 56; see generally id. ¶ 83.  However, Compton, Garcia and Benson "failed to push the few ISO's who have boarded merchants through CapX to pay for merchant processing equipment provided by MiCamp."  Id. ¶ 57.  As a result, MiCamp is withholding residuals from CapX, which paid for the costs of the terminals.  See id. ¶ 58.

CapX named its anticipated "discount for cash" product "WAVit" and filed a trademark registration on May 26, 2017.  See id. ¶ 30.  But Compton and Garcia never possessed the "discount for cash" technology that they touted to CapX to induce it to enter into the Business Services Agreement, nor did they possess even the intellectual property required to develop "discount for cash" technology.  Id. ¶¶ 81-82.  Instead, after entering into the Business Services Agreement, Compton and Garcia "sought out" MiCamp "to create the technology they had promised CapX."  See id. ¶ 83.  MiCamp ultimately developed a "clover

app"[2] for the "discount for cash" technology, and MiCamp has been holding out the "WAVit" mark as its own, in violation of CapX's trademark.  See id. ¶ 86.

Compton and Garcia also introduced CapX to SplitIT, an Israel-based company, which had technology that would enable customers to pay a portion of the balance due during a purchase and the remaining amount over time.  See id. ¶ 59.  CapX entered into an agreement with SplitIT North America.  See id. ¶ 60.  Compton did not disclose to CapX that he is the CEO of SplitIT North America, which had been formed days earlier, nor did Garcia and Benson disclose that they were employed by SplitIT North America.  See id. ¶¶ 61-63.

In violation of their Agreements with CapX, defendants Compton, Garcia and Benson have been sending CapX customers, prospective customers and sales representatives to Bryte Payments, a competitor of CapX.  See id. ¶ 74.  For example, Compton, Garcia and Benson "worked . . . to move" Hotel V, a merchant of CapX, to Bryte Payments.  See id. ¶ 75.

In addition, Compton, Garcia and Benson falsified expenses and reimbursement requests and used CapX funds for personal and/or alternate purposes.  See id. ¶ 77.  In late January 2018, Benson unilaterally terminated the Consulting Agreement, "upon inquiries by CapX as to Benson's time and discussions."  Id. ¶ 80.

## PROCEDURAL BACKGROUND

Following the initiation of this lawsuit on April 19, 2018, defendants appeared through counsel, answered the Complaint, see Answer (May 29, 2018), DE #15, and thereafter filed an Amended Answer and Counter-claims, alleging that the plaintiffs/counterclaim defendants had failed to remit the fees and reimbursement for expenses required under the Business Services

---

[2] Clover is a system that accepts credit cards, debit cards, gift cards, and contactless payments.  See Clover, https://www.clover.com/pos-systems/accept-payments (last visited on 12/15/22).

Agreement, see Amended Answer (Oct. 11, 2018), DE #20. The parties conducted discovery until June 2019, when deposition discovery was stayed pending a ruling by the District Court regarding whether the Court had subject matter jurisdiction over the action. See Joint Motion to Stay Discovery (June 4, 2019), DE #42; Order (June 10, 2019). After Judge Irizarry determined that subject matter jurisdiction existed, counsel for defendants moved to withdraw. See Motion to Withdraw as Counsel (May 13, 2020), DE #47; Motion to Amend/ Correct/Supplement (Aug. 25, 2020), DE #48. After initially denying counsel's motion without prejudice, this Court granted counsel leave to withdraw, on October 5, 2020. See Order (Oct. 5, 2020), DE #52; Order (Aug. 27, 2020). No successor counsel has appeared in the case.

On February 4, 2021, observing that the parties had taken no further action in the case, this Court issued an Order to Show Cause why the parties' claims and counterclaims should not be dismissed for lack of prosecution. See Order to Show Cause (Feb. 4, 2021). Having thereafter considered plaintiffs' response, the Court declined to recommend dismissal of plaintiffs' claims, but observed that defendants' failure to respond to the Order to Show Cause demonstrated the abandonment of their counterclaims. See Order (Mar. 4, 2021). Subsequently, on May 17, 2021, all parties appeared for a telephonic discovery conference before the undersigned, at which the Court set a deadline for the completion of fact discovery and for filing a letter requesting a premotion conference before the District Court. See Minute Entry (May 17, 2021), DE #61. The parties proceeded to court-annexed mediation, which was unsuccessful. See Order Referring Case to Mediation (Oct. 7, 2021); Report of Mediation Unsettled (Jan. 21, 2022).

On February 17, 2022, plaintiffs requested a premotion conference in anticipation of moving for summary judgment. See Premotion Conference Request (Feb. 17, 2022), DE #65. Although Judge Irizarry denied without prejudice plaintiffs' application for a premotion conference, the District Court set a final deadline for the corporate defendant ProfitSTAT to appear through counsel or have its Answer stricken and a default entered. See Order (Feb. 18, 2022). On April 7, 2022, based on ProfitSTAT's failure to comply, Judge Irizarry directed that the Answer of ProfitSTAT be stricken and a default entered against it. See Order (Apr. 7, 2022). Meanwhile, the individual defendants had failed to respond to plaintiffs' premotion letter, in violation of Judge Irizarry's directive. See Order (Apr. 28, 2022). On May 13, 2022, having extended the individual defendants' time to respond and warned them of the consequences of their failure to do so, Judge Irizarry struck the Answers of the individual defendants and entered defaults against them. See Order (May 13, 2022); see also Order (Apr. 28, 2022); Order (Apr. 7, 2022); Clerk's Entry of Default (June 15, 2022), DE #72; Clerk's Entry of Default (June 17, 2022), DE #73.

On June 21, 2022, citing the fact that plaintiffs had flouted her directive that plaintiffs serve defendants with copies of her order striking their Answers, and to file proof of service, Judge Irizarry directed plaintiffs to cure their omission, on pain of sanctions, adding that "Plaintiffs consistently have failed to comply with Court orders and Court rules." See Order (June 21, 2022).

On June 29, 2022, plaintiffs filed their first motion for default judgment, which Judge Irizarry summarily denied as lacking a supporting memorandum of law, in violation of her Individual Rules. See Order (July 6, 2022). After plaintiffs refiled their motion for default

8

judgment,[3] several weeks later, Judge Irizarry again denied the motion without prejudice, for neglecting to attach the referenced exhibits to their affidavit.  See Order (July 21, 2022). Plaintiffs then filed their third motion for default judgment, and Judge Irizarry admonished them for failing to serve copies of their papers on defendants, and directed them to do so.  See Order (July 29, 2022).

The instant motion was then referred to the undersigned magistrate judge.  See Motion Referred (July 29, 2022).  Upon a preliminary review of plaintiffs' motion papers, the Court identified critical deficiencies.  Plaintiffs had not addressed the legal sufficiency of their claims, identified those causes of action on which plaintiffs were seeking default judgment, nor explained the basis for the amount of the damages they were seeking.  See Scheduling Order (Sept. 6, 2022) ("9/6/22 Order"), DE #85.  In fact, plaintiffs had proffered neither of the two contracts underlying their breach of contract claims.  See id. at 1-2.  The Court directed plaintiffs to supplement their submissions by "explaining the factual and legal bases for the damages sought[.]"  Id. at 2.

Upon review of plaintiffs' supplemental submissions, the Court found that "plaintiffs have still not provided any legal analysis to support their claims of liability and damages."  See Order (Oct. 28, 2022) at 1, DE #88.  The Court directed plaintiffs to file further submissions "specifically connecting the proposed damages figures to the legal claims on which plaintiffs contend that liability has been established, and setting forth the legal principles applicable to plaintiffs' claims and request for damages (including whether the appropriate plaintiff and/or defendant are named in that claim)."  Id. at 2.  Despite having secured an extension of time to

---

[3] As noted infra, the accompanying memorandum of law comprises three pages of unhelpful boilerplate.

file further submissions, see Order (Nov. 3, 2022), plaintiffs docketed supplemental submissions that do not cure the deficiencies identified by the Court.

## DISCUSSION

### I.   Legal Standards

Generally, "[a] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability." Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995), abrogated on other grounds by 4 Pillar Dynasty LLC v. New York & Co., Inc., 933 F.3d 202 (2d Cir. 2019) (quoting Trans World Airlines. Inc. v. Hughes, 449 F.2d 51, 69 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363 (1973)).  Where a defendant has defaulted, "a court is required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor." Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009).  Nonetheless, "the default establishes [a defendant's] liability [only] as long as the complaint has stated a valid cause of action." Kuruwa v. Meyers, 823 F.Supp.2d 253, 256 (S.D.N.Y. 2011), aff'd, 512 F.App'x 45 (2d Cir. 2013) (citations omitted); see also Fed. R. Civ. P. 55(b)(2).  "In other words, even after a default, 'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law.'" Johnson & Johnson v. Azam Int'l Trading, No. 07-cv-4302 (SLT)(SMG), 2013 WL 4048295, at *8 (E.D.N.Y. Aug. 9, 2013) (quoting Labarbera v. ASTC Labs., Inc., 752 F.Supp.2d 263, 270 (E.D.N.Y. 2010)); see also Taizhou Zhongneng Imp. & Exp. Co. v. Koutsobinas, 509 F.App'x 54, 56 (2d Cir. 2013) (defaulting defendant's liability depends on whether "allegations are sufficient to state a cause of action"); Chen v. JP

Standard Constr. Corp., 14-CV-1086 (MKB), 2016 WL 2909966, at *4 (E.D.N.Y. Mar. 18, 2016), adopted, 2016 WL 2758272 (E.D.N.Y. May 12, 2016).

Thus, "while the factual allegations of the complaint [against a defaulting defendant] need not be set forth in detail, they must be adequate to permit a 'reasonable inference that the defendant is liable for the misconduct alleged[.]'" Johnson & Johnson, 2013 WL 4048295, at *8 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Despite a defendant's default, "a complaint containing only '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do[es] not suffice.'" Johnson & Johnson, 2013 WL 4048295, at *8 (quoting Iqbal, 556 U.S. at 678) (alterations by court in Johnson & Johnson). Ordinarily, subject to narrow exceptions, a court may not consider documents outside of the pleadings in evaluating a defendant's liability on a motion for default judgment. See J & J Sports Prods., Inc. v. Abdelraouf, 18-cv-2547 (ARR) (VMS), 2019 WL 457719, at *4 (E.D.N.Y. Feb. 5, 2019); Johannes Baumgartner Wirtschafts-Und Vermögensberatung GmbH v. Salzman, 969 F.Supp.2d 278, 287 (E.D.N.Y. 2013).

As for damages, the amount pleaded by a plaintiff is not deemed to be established by the defendant's default; the Court must conduct "an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999) (citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)). The plaintiff "bears the burden of establishing [its] entitlement to recovery and thus must substantiate [its] claim with evidence to prove the extent of damages." Dunn v. Advanced Credit Recovery Inc., No. 11 Civ. 4023(PAE) (JLC), 2012 WL 676350, at *2 (S.D.N.Y. Mar. 1, 2012), adopted, 2012 WL

11

1114335 (S.D.N.Y. Apr. 3, 2012). Accordingly, the "court cannot simply rely on the [p]laintiff's statement of damages; there must be a basis upon which the court may establish damages with reasonable certainty." House v. Kent Worldwide Mach. Works, Inc., 359 F.App'x 206, 207 (2d Cir. 2010).

## II. Liability

Local Civil Rule 7.1 provides that, "[e]xcept . . . as otherwise permitted by the court, all motions shall include the following motion papers: . . . [a] memorandum of law, setting forth the cases and other authorities relied upon in support of the motion, and divided, under appropriate headings, into as many parts as there are issues to be determined[.]" S.D.N.Y./ E.D.N.Y. Local Civil Rule 7.1. In addition, Judge Irizarry's Individual Motion Practices and Rules require that a motion for default judgment be supported by a memorandum of law setting forth the grounds for awarding damages. In the case at bar, after Judge Irizarry rejected plaintiffs' first motion for default judgment and directed them to file a memorandum of law, plaintiffs filed a three-page memorandum of law that does not address the legal sufficiency of plaintiffs' claims or request for damages. See Memorandum in Support (July 19, 2022), DE #79-1. Accordingly, this Court requested that plaintiffs supplement their submissions to set forth the legal principles applicable to plaintiffs' claims and request for damages. Plaintiffs' repeated failure to do so impedes this Court's ability to determine whether plaintiffs' allegations entitle them to relief. On that basis alone, this Court would have been amply warranted in recommending denial of plaintiffs' motion for default judgment. See Exact Invs. LLC v. Vesnaverboth, CV 17-6109 (DRH) (ARL), 2021 WL 8316287, at *1 (E.D.N.Y. July 12, 2021), adopted, 2021 WL 8316285 (E.D.N.Y. Sept. 21, 2021); Trs. of Bldg. Trades

Educ. Benefit Fund v. Bridge Elec. NJ, LLC, CV 20-3376 (DRH) (ARL), 2021 WL 6424628, at *1 (E.D.N.Y. Dec. 22, 2021), adopted, 2022 WL 103666 (E.D.N.Y. Jan. 11, 2022); Wider Consol., Inc. v. Vision Prods. Co., Ltd., 17-CV-3427 (RRM) (ST), 2018 WL 1320685, at *3 (E.D.N.Y. Feb. 22, 2018), adopted, 2018 WL 1320664 (E.D.N.Y. Mar. 13, 2018). Nevertheless, in the interest of bringing this long-pending action to a conclusion, and in the event Judge Irizarry is inclined to address the merits of plaintiffs' claims and demand for damages, the Court proceeds to analyze plaintiffs' claims.

     **A.**    **Choice of Law**

     This Court must first determine what law should be applied to plaintiffs' claims.  See, e.g., D'Amato v. Five Star Reporting, Inc., 80 F.Supp.3d 395, 407 (E.D.N.Y. 2015) ("As an initial matter, the Court must determine what law should be applied to the [p]laintiff's common law breach of contract and equitable claim[ ] for unjust enrichment[.]").  The instant case was predicated upon diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1).  The Second Circuit has held that a federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  See Maryland Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003).  In a contract dispute, New York courts generally will honor a choice-of-law provision in an agreement.  See Scharnikow v. Siracuse, 15-CV-6991 (DRH) (SIL), 2016 WL 7480360, at *3 (E.D.N.Y. Dec. 6, 2016), adopted, 2016 WL 7480364 (E.D.N.Y. Dec. 29, 2016); Royal Dispatch Servs., Inc. v. UBS Fin. Servs., Inc., No. 12-CV-2032 (JG)(RLM), 2012 WL 3113291, at *2 n.4 (E.D.N.Y. July 31, 2012).  Each of the relevant Agreements in this case includes a choice-of-law provision, which provides that New York state law governs the claims arising out of the performance of the parties' obligations thereunder.  See Business Services

Agreement ¶ 12(d), DE #87-8 at ECF p.7; Consulting Agreement ¶ 16(a), DE #87-9 at ECF p. 6.[4]  In any event, where, as here, the parties do not raise choice-of-law as an issue, "it can be said that they have consented to the application of the forum state's law." Scharnikow, 2016 WL 7480360, at *3 (quoting Mangual v. Pleas, No. 02 Civ. 8311(CBM), 2005 WL 2179083, at *2 n.1 (S.D.N.Y. Sept. 8, 2005)); see Chung v. Sano, No. 10 CV 2301(DLI), 2011 WL 1303292, at *7 (E.D.N.Y. Feb. 25, 2011) (applying New York law where plaintiff "ha[d] not taken any position" and defendants defaulted), adopted, 2011 WL 1298891 (E.D.N.Y. Mar. 31, 2011).   As plaintiffs herein make no choice-of-law argument, and as defendants have proffered no argument to the contrary by virtue of their default, the Court applies New York law to the claims and issues in this action.

**B.    Breach of Contract**

Plaintiffs assert claims for breach of the Business Services Agreement against defendants Compton, Garcia and ProfitSTAT (First Count) and for breach of the Consulting Agreement against defendant Benson (Second Count).  In order to state a claim for breach of contract under New York law, plaintiff must show: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) breach of the contract by the defendant; and (iv) damages.  See Orlander v. Staples, Inc., 802 F.3d 289, 294 (2d Cir. 2015); BASF Corp. v. Prime Auto Collision Inc., 20-CV-4797 (NGG) (RLM), 2022 WL 704127, at *5 (E.D.N.Y. Mar. 9, 2022).

---

[4] The Court may rely on the provisions of the Business Services Agreement and Consulting Agreement because they were incorporated into the Complaint by the pleading's reference to the provisions of those contracts.  See Flanagan v. Marco Martelli Assocs., Inc., No. 13-CV-6023(ADS)(AKT), 2015 WL 1042279, at *3 n.1 (E.D.N.Y. Mar. 9, 2015); Gesualdi v. Interstate Masonry Corp., No. 12–CV–0383 (NGG)(VMS), 2014 WL 1311709, at *3 n.1 (E.D.N.Y. Mar. 28, 2014).

1.   Business Services Agreement

CapX has adequately pleaded ProfitSTAT's liability for breach of contract in the First Count.  As to the first element—the existence of a contract—the Complaint alleges, and the relevant agreement supports, that CapX and ProfitSTAT entered into a contract under which ProfitSTAT agreed, amongst other provisions, to work exclusively for CapX and to send all merchant-processing deals and sub-ISO arrangements to CapX.  See Compl. ¶ 25.  Thus, CapX has adequately alleged that an enforceable contract existed between those parties.  CapX further claims that it performed its obligations, thereby satisfying the second element, in that it paid the requisite monthly fee and reimbursed expenses of ProfitSTAT.  See id. ¶ 29.  As to the third element (defendants' breach), plaintiffs allege that ProfitSTAT violated the Business Services Agreement by working independently with merchants and/or ISOs that were being referred to CapX, as well as with other merchants that were never referred to CapX, and sought to divert these potential clients and/or ISOs for its own benefit.  See id. ¶¶ 37-38.  Finally, according to the pleading, CapX suffered damages as a result of ProfitSTAT's failure to perform its obligations under the Business Services Agreement.  See id. ¶ 93.  Having pled each element of the first cause of action, CapX has established its claim for breach of contract under New York law.

In contrast, plaintiffs Prepaid Ventures and PPV Holdings have failed to establish the first element of their breach of contract claim in the First Count because those entities were not parties to the Business Services Agreement.  It is well established "that the terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract[.]"  Rajamin v. Deutsche Bank Nat'l Tr. Co., 757 F.3d 79, 86 (2d Cir. 2014) (citing

Mendel v. Henry Phipps Plaza West Inc., 6 N.Y.3d 783, 786 (2006)).  Plaintiffs have not

alleged that Prepaid Ventures or PPV Holdings are intended third-party beneficiaries.  Thus,

the First Count breach of contract claim brought by Prepaid Ventures and PPV Holdings must

fail because they are not parties to this contract.

Nor does their status as parent companies of CapX give those entities standing to sue.

"New York law bars parent corporations from bringing direct suits aimed at vindicating

injuries suffered by their subsidiaries."  Nature's Plus Nordic A/S v. Nat. Organics, Inc., 980

F.Supp.2d 400, 409 (E.D.N.Y. 2013) (quoting AEP–PRI Inc. v. Galtronics Corp. Ltd., No.

12 Civ. 8981(PAE), 2013 WL 4400833, at *8 (S.D.N.Y. Aug. 13, 2013)); see Hudson Optical

Corp. v. Cabot Safety Corp., 162 F.3d 1148, 1998 WL 642471, at *3 (2d Cir. Mar. 25, 1998)

(summary order); Variblend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc., 18-cv-

10758 (ER), 2022 WL 17156550, at *10 (S.D.N.Y. Nov. 22, 2022); 42-50 21st St. Realty

LLC v. First Cent. Sav. Bank, 20-CV-5370 (RPK) (RLM), 2022 WL 1004187, at *13

(E.D.N.Y. Apr. 4, 2022).  Accordingly, this Court recommends denying all claims brought by

Prepaid Ventures, Ltd. and PPV Holdings, LLC.

Similarly, plaintiffs have not stated a claim against defendants Compton and Garcia for

breach of contract, as they were not parties to the Business Services Agreement.  See ATAX

N.Y., Inc. v. Canela #1, 21 Civ. 5916 (JPC), 2022 WL 3018151, at *7 (S.D.N.Y. July 29,

2022) (granting motion to dismiss breach of contract claim against entity as to which the

complaint "does not plausibly allege any facts as to the existence" of a contract between

plaintiffs and that entity); Bianco v. Seaway Indus. Servs., Inc., No. 03-CV-0084E(F), 2004

WL 912916, at *2-3 (W.D.N.Y. Apr. 1, 2004) (denying motion for default judgment against

individual who signed collective bargaining agreement on behalf of corporate defendant but who was not a party to that agreement).  Although Garcia signed the Business Services Agreement *on behalf of* ProfitSTAT, he did not thereby become a party to the contract.  See Rentrak Corp. v. Handsman, No. 12-CV-1576(JS)(ARL), 2014 WL 1342960, at *6 (E.D.N.Y. Mar. 31, 2014) ("[c]orporate officers may not be held personally liable on contracts of the corporation where they did not purport to bind themselves individually") (internal quotation marks and citation omitted); Bianco, 2004 WL 912916, at *2-3.  The default of Compton and Garcia serves to establish their liability if and only if the allegations in the pleadings are "sufficient to state a cause of action against the defendant[s]."  Taizhou Zhongneng Imp. & Exp. Co., 509 F.App'x at 56.

In sum, the Court concludes that CapX alone has sufficiently alleged a breach of contract claim in connection with the Business Services Agreement against ProfitSTAT, but against no other defendant.

2.    Consulting Agreement

Likewise, as to the Second Count, CapX alone—and not the other plaintiffs—has adequately pleaded defendant Benson's liability for breach of the Consulting Agreement.  The Complaint alleges that CapX and Benson entered into a contract—which has been made part of the record in connection with the instant motion—under which Benson agreed to use best efforts to recruit merchants to use CapX processors and banks and to recruit ISOs to sell CapX services and products.  See Compl. ¶ 33.  Benson also agreed to notify and obtain the approval of CapX before performing consulting work for any competitors.  See id. ¶ 34.  Thus, CapX has adequately alleged that an enforceable contract existed between those two parties.  CapX

17

performed its obligations under the Consulting Agreement by paying the requisite monthly consulting fees and reimbursing Benson's expenses.  See id. ¶¶ 33, 77, 96.  The Complaint further alleges that Benson breached the Consulting Agreement by failing to "disclose relationships that he was required to disclose pursuant to the [Consulting] Agreement."  Id. ¶ 98.  Finally, according to the pleading, CapX suffered damages as a result of Benson's violation of the terms of the Consulting Agreement.  See id. ¶ 99.

Thus, the Complaint adequately alleges that Benson breached his agreement with CapX.

C.    **Breach of Fiduciary Duty**

In the Third Count of the Complaint, plaintiffs contend that defendants Compton, Garcia and Benson owed them a fiduciary duty that was breached "through various acts of misconduct, including self-dealing, unfair competition, and improper use of [p]laintiffs' confidential information."  Compl. ¶¶ 101-102.

In New York, the elements of a claim for breach of fiduciary duty are: "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."  SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004).  "One type of fiduciary relationship arises in the employment context, with the employee prohibited from acting in any manner inconsistent with his agency or trust and bound to exercise the utmost good faith and loyalty in the performance of his duties."  Plaza Motors of Brooklyn, Inc. v. Rivera, 19-CV-6336 (LDH), 2020 WL 9814102, at *5 (E.D.N.Y. Sept. 17, 2020) (internal citations omitted), adopted, Order (Nov. 30, 2020) in 19-cv-6336.  "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another."  *In re* Refco Inc. Sec. Litig., 826 F.Supp.2d 478, 502-03

18

(S.D.N.Y. 2011) (quoting Penato v. George, 383 N.Y.S.2d 900, 904 (2d Dep't 1976)).  "The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another."  Id. at 503 (quoting Penato, 383 N.Y.S.2d at 904-05).

"A breach of fiduciary duty, and generally in tandem, of loyalty, occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, . . . or usurpation of the employer's business opportunity."  Poller v. BioScrip, Inc., 974 F.Supp.2d 204, 227 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).  When an employee uses an employer's proprietary or confidential information in establishing a competing business, the employee breaches his or her fiduciary duty to the employer.  See, e.g., CBS Corp. v. Dumsday, 702 N.Y.S.2d 248, 251 (1st Dep't 2000) (holding that plaintiff sufficiently stated a cause of action for breach of fiduciary and common law duties owed to plaintiff-employer, where defendants, while in plaintiff's employ, "planned, and later formed, a competing corporation" that obtained a valuable "contract using confidential information").  Moreover, a person acting in a fiduciary capacity is forbidden from obtaining an improper advantage at the principal's expense.  See, e.g., Sokoloff v. Harriman Estates Dev., 96 N.Y.2d 409, 416 (2001) ("an agent must not seek to acquire indirect advantages from third persons for performing duties and obligations owed to [the agent's] principal") (citation and internal quotations omitted) (alteration in original).

While defendants were consultants, rather than employees, of CapX, plaintiffs' allegation that defendants owed CapX fiduciary duties (see Compl. ¶ 101) stands uncontested,

and several provisions in the Agreements pertaining to non-competition, non-solicitation and confidentiality suggest a fiduciary relationship, see AM Cosmetics, Inc. v. Solomon, 67 F.Supp.2d 312, 321 (S.D.N.Y. 1999) (examining similar contractual provisions and denying summary judgment motion by consultant where "sufficient evidence exists which could persuade a reasonable trier of fact to find that a fiduciary relationship existed"); cf. G.K. Alan Assoc., Inc. v. Lazzari, 840 N.Y.S.2d 378, 384-85 (2d Dep't 2007) (affirming denial of motion by consultant defendant for summary judgment dismissing claim that he forfeited his right to compensation by breaches of loyalty).  Defendants owed CapX a duty of loyalty in working with CapX pursuant to the respective Agreements.  As reflected in the allegations in the Complaint and in the contractual agreements referenced therein, CapX "reposed in [d]efendants a degree of trust and confidence necessary for a fiduciary relationship."  AM Cosmetics, 67 F.Supp.2d at 320.

Moreover, in contrast to the situation with respect to CapX's breach of contract claims, a "corporate officer who participates in the commission of a tort may be held individually liable, . . . regardless of whether the corporate veil is pierced."  FLB, LLC v. Cellco P'ship, 536 F.App'x 132, 133 (2d Cir. 2013) (internal quotation marks and citation omitted); see Rentrak Corp., 2014 WL 1342960, at *6 (distinguishing between contract claim against non-signatory and tort claim against corporate officer who participated in commission of tort); Rajeev Sindhwani, M.D., PLLC v Coe Bus. Serv., Inc., 861 N.Y.S.2d 705, 709 (2d Dep't 2008).  Here, the fact that Compton and Garcia are not parties to the Business Consulting Agreement does not bar a breach of fiduciary duty claim against them.  As identified principals of ProfitSTAT, Compton and Garcia assumed a confidential and fiduciary relationship with

plaintiff CapX, which had a contractual relationship with ProfitSTAT.  Likewise, Benson assumed a confidential and fiduciary relationship with CapX, pursuant to the terms of the Consulting Agreement he entered into with CapX.  Plaintiffs allege that the individual defendants, while using CapX's reputation and financial resources, breached their fiduciary duties in that they worked independently with merchants and/or ISOs and engaged in efforts to divert those potential clients and/or ISOs away from CapX for their own benefit, thereby injuring CapX.  As the Complaint sufficiently alleges a claim by CapX for breach of fiduciary duty against Compton, Garcia and Benson, the Court respectfully recommends that default judgment be granted against them, and in favor of CapX alone, with respect to the Third Count.

### D.   <u>Fraud Claims</u>

Plaintiffs allege two causes of action sounding in fraud— Fraudulent Concealment by Fiduciary (Fourth Count) and Constructive Fraud in Contract (Fifth Count).  Each of these claims is subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires the pleading party to "state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b); see <u>Goulding v. Osceola Gold, Inc.</u>, No. 16 C 4860, 2017 WL 690549, at *4 (N.D. Ill. Feb. 21, 2017) (fraud by fiduciary); <u>Spinnato v. Unity of Omaha Life Ins. Co.</u>, 322 F.Supp.3d 377, 404 (E.D.N.Y. 2018) (constructive fraud).

Under Rule 9(b), a plaintiff alleging fraud is required to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 347 (2d Cir. 1996) (citations

omitted); see Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 197 (2d Cir. 2013). Plaintiffs herein have failed to plead any precise details of the allegedly fraudulent scheme. For example, plaintiffs have grouped the defendants together and fail to particularize the specific role and acts of each defendant. The Complaint's vague allegation that the individual defendants "concealed facts from Plaintiffs regarding their relationships with various entities" is insufficient to impose liability. Both claims fail to set forth "the who, what, when, where, and how of the alleged fraud." United States v. Tishman Constr. Corp., 12-cv-03862 (DLI) (RER), 2017 WL 1093190, at *4 (E.D.N.Y. Mar. 23, 2017) (internal quotation marks and citation omitted); see Louis Hornick & Co., Inc. v. Darbyco, Inc., No. 12 Civ. 5892(LTS), 2013 WL 3819643, at *4 (S.D.N.Y. July 23, 2013) (dismissing fraud claim for lack of particularity where plaintiff had not "identified any specific statements made by any of the Defendants or their agents, or when, where and by whom those statements were made"). Thus, the Fourth and Fifth Counts should be dismissed under Rule 9(b) for lack of particularity.[5]

---

[5] In addition, a plaintiff cannot maintain a claim for fraud "when the only fraud charged relates to a breach of contract, or where the fraud claim is duplicative of, or inextricably related to, a breach of contract claim." Dooley v. Metro. Jewish Health Sys., No. 02–CV–4640(JG), 2003 WL 22171876, at *10 (E.D.N.Y. July 30, 2003) (internal quotation marks and citation omitted); see Helios Int'l S.A.R.L. v. Cantamessa USA, Inc., No. 12 Civ. 8205, 2013 WL 3943267, at *11 (S.D.N.Y. July 31, 2013). Here, plaintiffs' allegations in support of their fraud claims appear to recycle the same allegations underlying the breach of contract claims. Compare, e.g., Compl. ¶ 37 ("Contrary to the ProfitSTAT Agreement, Compton and Garcia were working independently both with merchants that were being referred to CapX and with others who were never referred to CapX, without CapX's knowledge or consent."), with id. ¶ 107 ("Compton, Garcia, and Benson have, individually and collectively, concealed facts from Plaintiffs regarding their relationships with various entities that Plaintiffs either have a contractual relationship or a prospective relationship."). Accordingly, the fraud claims should be dismissed on that additional basis, see Helios Int'l, 2013 WL 3943267, at *11 (dismissing fraud claim where "the cause of action at issue . . . does not allege the breach of a duty extraneous to, or distinct from the contract between the parties") (internal quotation marks and citation omitted), at least as against the contracting defendants, see Sun Prods. Corp. v. Bruch, 507 F.App'x 46, 48 (2d Cir. 2013) ("a fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable") (internal quotation marks, citation, and emphasis omitted).

E.       **Contract Performance Interfered with By Outsider**

The Court treats plaintiffs' Sixth Count as one for intentional interference with a contractual relationship.  Plaintiffs allege that CapX entered into contracts with entities SecuraBull, Diversified, SplitIT North America and MiCamp, and that defendants Compton, Garcia and Benson intentionally interfered with the performance of those contracts by making promises to those entities on behalf of CapX without CapX's knowledge or consent.  See Compl. ¶¶ 118-119.

The tort of intentional interference with contractual relations is comprised of four elements: "To establish tortious interference [with an existing contract under New York law], a plaintiff must show '(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages.'"   White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 285 (2d Cir. 2006) (quoting Foster v. Churchill, 87 N.Y.2d 744, 749-50 (1996)); see Rich v. Fox News Network, LLC, 939 F.3d 112, 126-27 (2d Cir. 2019); see also MMS Trading Co. Pty Ltd. v. Hutton Toys, LLC, 20-CV-1360 (MKB), 2021 WL 1193947, at *12 (E.D.N.Y. Mar. 29, 2021).  The first element of such a claim requires specificity of the contract at issue:  "conclusory allegations of interference with an unspecified contract are insufficient." Ahluwalia v. St. George's Univ., LLC, 63 F.Supp.3d 251, 266 (E.D.N.Y. 2014) (internal quotation marks and citation omitted), aff'd, 626 F.App'x 297 (2d Cir. 2015). Rather, to state a claim for tortious interference with contract, a "plaintiff must identify the specific third-party contract with which the defendant allegedly interfered." MMS Trading Co., 2021 WL 1193947, at *12 (citing Valley Lane Indus. Co. v. Victoria's Secret Direct

Brand Mgmt., L.L.C., 455 F.App'x 102, 104 (2d Cir. 2012)).  It is insufficient for the

pleading to describe the contract in general terms; "[i]t is imperative that, in bringing a tortious

interference claim, a plaintiff identify 'the relevant terms of the contract[ ] that existed' that

were breached by defendant."  Alvarado v. Mount Pleasant Cottage Sch. Dist., 404 F.Supp.3d

763, 791 (S.D.N.Y. 2019) (citing Leadsinger, Inc. v. Cole, No. 05 Civ. 5606(HBP), 2006

WL 2320544, at *12 (S.D.N.Y. Aug. 10, 2006)).  Thus, the pleading must provide factual

allegations concerning "the formation of the contract, the date it took place, and the contract's

major terms[.]"  Valley Lane Indus., 455 F.App'x at 104; see MMS Trading Co., 2021 WL

1193947, at *12.

    "As to the third element, the intentional procurement of a breach element requires a

plaintiff to establish that but for the allegedly tortious conduct of the defendant, the third party

would not have breached [its] contract."  Reach Music Publ'g, Inc. v. Warner/Chappell

Music, Inc., No. 09 Civ. 5580(KBF), 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014)

(citing Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir. 1990) (affirming

dismissal of tortious interference claim)); see MMS Trading Co., 2021 WL 1193947, at *12.

Indeed, an "actual breach of a specified contract" must be pled to sustain this claim.  See Riley

v. Rivers, 15-CV-5022 (DLI), 2016 WL 11263672, at *7 (E.D.N.Y. Sept. 19, 2016) (quoting

Ahluwalia, 63 F.Supp.3d at 266), adopted, 2017 WL 1093193 (E.D.N.Y. Mar. 23, 2017)

(Irizarry, J.), aff'd, 710 F.App'x 503 (2d Cir. 2018); see NBT Bancorp Inc. v. Fleet/Norstar

Fin. Grp., Inc., 87 N.Y.2d 614, 621 (1996) ("breach of contract has repeatedly been listed

among the elements of a claim for tortious interference with contractual relations").

Here, plaintiffs have not sufficiently described in their Complaint any contracts that they entered into with third parties, nor have they alleged that any such contract was actually breached.  See MMS Trading Co., 2021 WL 1193947, at *12; Lokai Holdings LLC v. Twin Tiger USA LLC, 306 F.Supp.3d 629, 643 (S.D.N.Y. 2018) (dismissing intentional interference with contract counterclaim where the pleading "fail[ed] to provide any details about the contracts—such as when they were formed, when they took place, and what the major terms were—or even attach the contracts to the complaint"); Katz v. Travelers, 241 F.Supp.3d 397, 408–09 (E.D.N.Y. 2017) (dismissing tortious interference with contract claim where the complaint "merely state[d] that 'insurance carriers and third party independent medical companies [ ] terminated and/or suspended their contractual relationship with Plaintiffs based on the false and misleading statements made by the [D]efendants'") (alterations by court in Katz).

For example, regarding SecuraBull, the pleading neither specifies the terms of the contract nor alleges that SecuraBull breached its contract with CapX.  Rather, plaintiffs assert only that due to defendants' conduct, ISOs such as SecuraBull "are now complaining about CapX's inability to perform and non-payment of residuals."  Compl. ¶ 53.  Regarding Diversified, the Complaint alleges that "Diversified has attempted to terminate the Diversified Agreement claiming that CapX owes it money for development work it did towards a particular merchant customer, Yur Drivers Network . . . ."  Compl. ¶ 67.  Again, plaintiffs fail to allege that Diversified breached a contract with CapX.  Regarding SplitIT North America, while plaintiffs claim that they "entered into an agreement with" that entity, id. ¶ 60, critically, they do not allege that their agreement with SplitIT North America has been breached.  The

Complaint's vague assertions that defendants made promises to SplitIT without CapX's knowledge is legally insufficient to sustain this claim. The allegations regarding MiCamp fail for the same reason, to wit, plaintiffs do not allege a breach of its ISO agreement with MiCamp. In sum, the pleading fails to allege breaches of those contracts or to adequately explain the nature of the alleged breaches. See Kirch v. Liberty Media Corp., 449 F.3d 388, 402 (2d Cir. 2006) (affirming dismissal of tortious interference with contract claim because "plaintiffs fail[ed] to allege . . . actual breach" in that acts pled did "not amount to an allegation that [the contracting party] violated the terms of a contract"); INV Accelerator, LLC v. MX Techs., Inc., 19-CV-2276 (AJN), 2020 WL 882902, at *5 (S.D.N.Y. Feb. 24, 2020) (dismissing tortious interference counterclaim that failed to allege an actual breach of contract, inasmuch as "[t]here [was] no information as to how" the relevant third party breached the contract).[6] Hence, the Sixth Count asserted by plaintiffs fails to state a claim for tortious interference with contract.

## F.    Intentional Interference with Prospective Economic Advantage

In connection with the Seventh Count, plaintiffs allege that CapX "maintained business relationships with various third-parties, including but not limited to, the Dallas Cowboys and related entities[,]" and that Compton, Garcia and Benson "interfered with those business

---

[6] Moreover, the tortious conduct alleged by plaintiffs is essentially the same conduct as that alleged in the claims asserting breach of contract. "Where the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty 'independent' of its duties under the contract; otherwise plaintiff is limited to an action in contract." Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003); Phoenix Ancient Art, S.A. v. J. Paul Getty Tr., 17 Civ. 241 (ER), 2018 WL 1605985, at *8 (S.D.N.Y. Mar. 29, 2018) (dismissing intentional interference claim as against several defendants, including individual who was not a contracting party, on the ground that such claim was duplicative of breach of contract claim). The terms of the respective Agreements provide that each defendant "has no authority to enter into contracts that bind [CapX] or create obligations on the part of [CapX] without the prior written authorization of [CapX]." Business Services Agreement ¶ 7(b); Consulting Agreement ¶ 8. Thus, the tortious conduct underlying the Sixth Count—making promises to entities on behalf of CapX without CapX's knowledge or consent, see id. ¶¶ 118-119, is directly addressed by the terms of the Agreements.

relationships by promising to provide the same services that CapX was supposed to provide" and "used dishonest, unfair or improper means" in doing so.  Id. ¶¶ 123-125.

In the absence of a contractual relationship with a third party, a plaintiff may nevertheless be able to assert a claim for tortious interference with prospective economic advantage.  To state a claim for tortious interference with prospective economic advantage under New York law, the plaintiff must allege that "(1) that [he] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Friedman v. Coldwater Creek, Inc., 321 F.App'x 58, 59-60 (2d Cir. 2009) (quoting Kirch, 449 F.3d at 400) (brackets added in Friedman).  This tort does not require the existence of a contractual relationship.  See NBT Bancorp, 87 N.Y.2d at 621.  Importantly, "'the plaintiff must establish that it would have entered into an economic relationship with the third party but for the defendant's wrongful conduct.'"  Whitehurst v. 230 Fifth, Inc., 998 F.Supp.2d 233, 248 (S.D.N.Y. 2014) (quoting C=Holdings B.V. v. Asiarim Corp., 992 F.Supp.2d 223, 246 (S.D.N.Y. 2013)) (internal alterations and quotation marks omitted).  "Proving this 'but for' causation requires more than a showing that it was 'reasonably certain' or that [plaintiffs] had a 'reasonable expectation' that the . . . deal[s] would be consummated."  Catskill Dev., L.L.C. v. Park Place Entm't Corp., 217 F.Supp.2d 423, 440 (S.D.N.Y. 2002) (collecting cases) (internal quotation marks omitted), vacated in part on other grounds, 2003 WL 22358852 (S.D.N.Y. Oct.7, 2003).

Because "the plaintiff must allege a specific business relationship with an identified third party with which the defendants interfered[,]" Mehrhof v. Monroe-Woodbury Cent. Sch.

Dist., 91 N.Y.S.3d 503, 505 (2d Dep't 2019), the Sixth Count does not state a cause of action

for tortious interference with prospective economic advantage.  Plaintiffs fail to plausibly

allege that they had business relationships with various third parties, including a relationship

with the Dallas Cowboys.  On the contrary, the pleading asserts that Compton and Garcia

"purported to make introductions to high-end potential clients (including the Dallas Cowboys)"

but diverted those opportunities to themselves.  See id. at p. 2.  Similarly, plaintiffs allege that

before entering into the Business Services Agreement with ProfitSTAT, "Compton and Garcia

told CapX that they had an 'in' with the Dallas Cowboys."  Id. ¶ 40.  These allegations

suggest that CapX did not actually have a relationship with the Dallas Cowboys with which

defendants could interfere.

        Plaintiffs must also demonstrate that defendants' tortious conduct was a "but for" cause

of the damages alleged.  See C=Holdings, 992 F.Supp.2d at 246 (quoting Premium Mortg.

Corp. v. Equifax, Inc., 583 F.3d 103, 107 (2d Cir. 2009)).  Here, plaintiffs have not alleged

that, but for defendants' conduct, the third parties would have done business with CapX.  In

fact, nothing in the pleading suggests that plaintiffs had a reasonable expectation of conducting

business with those third parties.  Rather, plaintiffs allege only that "CapX never entered into

an agreement with the Cowboys or any of the other high-end potential clients."  Compl. ¶ 42;

see id. ¶ 46 ("Despite extensive discussions between CapX and Sigue, the parties never

reached an agreement.").  Absent any factual allegations to demonstrate that the third parties

would have done business with CapX but for defendants' conduct, plaintiffs have not

articulated a plausible claim for tortious interference with prospective economic advantage.[7]

---

[7] The emails submitted by plaintiffs show, at most, that defendants had conversations with prospective clients, not that they had a reasonable expectation of securing their business.  See DE #87-4 at ECF pp. 82-94.  In fact, some

See White v. Pawelsky, 19-cv-05246 (GRB) (ST), 2021 WL 7908050, at \*6 (E.D.N.Y. Mar. 14, 2021) ("the facts as alleged do not show that Plaintiff would have been awarded the contract but for Defendant's alleged interference"); MMS Trading Co., 2021 WL 1193947, at \*15 (dismissing interference claim where plaintiff insufficiently alleged that defendant's "acts injured particular relationships"); Popat v. Levy, 328 F.Supp.3d 106, 141 (W.D.N.Y. 2018) (finding insufficient factual allegations that plaintiff's business relationship "was injured as a result of" defendant's conduct); see also Smart Team Glob. LLC v. HumbleTech LLC, 19-CV-4873 (AJN) (BCM), 2022 WL 847301, at \*8 (S.D.N.Y. Feb. 18, 2022) (applying Virginia law, recommending that default judgment be denied on tortious interference claim where "plaintiff does not allege any facts that would explain why it expected those relationships to continue, much less why it had a 'reasonable certainty' that it would have retained the business of those customers absent defendant's misconduct"), adopted, 2022 WL 846927 (S.D.N.Y. Mar. 22, 2022).

Further, to sustain the Sixth Count, plaintiffs must allege that defendants "used 'wrongful means'" while interfering with CapX's business prospects with third parties. See Target Corp. v. RichRelevance, Inc., 15 Civ. 6614 (LGS), 2017 WL 590316, at \*8 (S.D.N.Y. Feb. 13, 2017); Whitehurst, 998 F.Supp.2d at 247. "[A]s a general rule, a defendant's conduct must amount to a crime or an independent tort" in order to constitute tortious interference with a prospective (non-contractual) economic advantage. Friedman, 321 F.App'x at 60 (citing Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004)). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable

---

of the emails show Garcia or Benson attempting to arrange meetings with prospective clients, with little response by CapX. See, e.g., email from Chris Benson dated 10/10/17 re Wakefern Foods, DE #87-4 at ECF pp. 78-81.

for this tort if he has employed 'wrongful means[,] . . . includ[ing] physical violence, fraud or misrepresentation[,]" Friedman, 321 F.App'x at 60 (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (1980)), and "extreme and unfair economic pressure," Carvel Corp., 3 N.Y.3d at 192 (internal quotation marks omitted); see Whitehurst, 998 F.Supp.2d at 247. The term "wrongful means" does not "include persuasion alone although it is knowingly directed at interference with the [prospective] contract[.]" Guard–Life, 50 N.Y.2d at 191. Moreover, the defendant's conduct must be, "'by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.'" Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp., No. 08 Civ. 7956(PKC), 2013 WL 395096, at *16 (S.D.N.Y. Feb. 1, 2013) (quoting Carvel, 3 N.Y.3d at 192); see Lan Sang v. Ming Hai, 951 F.Supp.2d 504, 528 (S.D.N.Y. 2013).

Here, plaintiffs' allegation that the individual defendants "used dishonest, unfair, or improper means" (Compl. ¶ 125) is entirely conclusory. "The wrongful means element sets a high bar." Target, 2017 WL 590316, at *8 (internal quotation marks and citation omitted). The pleading is devoid of factual allegations describing the sort of tortious conduct directed at third parties that is necessary to state such a claim. See Valley Lane Indus., 455 F.App'x at 106-07 (affirming dismissal of tortious interference claim where plaintiff's allegation that defendant "used deceit, deception and coercion" was conclusory); Popat, 328 F.Supp.3d at 140-41 (granting motion to dismiss where "there are no allegations that [defendant] directed any behavior that could be construed as constituting 'wrongful means' towards" third party). New York courts have recognized a "narrow" exception to this requirement "where a defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on

30

plaintiffs." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) (internal quotation marks and citations omitted). Nevertheless, where, as here, the defendants' alleged "'motive in interfering . . . was normal economic self-interest,'" that narrow exception does not apply. Carvel, 3 N.Y.3d at 190; see Pike Co., Inc. v. Universal Concrete Prods., Inc., 524 F.Supp.3d 164, 182–83 (W.D.N.Y. Mar. 10, 2021). Indeed, the Complaint does not allege that defendants acted solely for the purpose of damaging CapX. See generally Compl. ¶¶ 123-126. Nor do plaintiffs allege that defendants made any misrepresentations to the targeted third parties. See Valley Lane Indus., 455 F.App'x at 106-07 (observing that because the alleged conduct was directed at plaintiff, rather than third party, plaintiff could not satisfy the "wrongful means element"); Brown Media Corp. v. K & L Gates, LLP, 586 B.R. 508, 531 (E.D.N.Y. 2018) (dismissing tortious interference claim because plaintiff "fails to allege any actions taken against the [third parties] by the Defendants").

For the foregoing reasons, the Court recommends dismissal of plaintiffs' claim for tortious interference.[8]

## G.    Promissory Estoppel, Unjust Enrichment and Unfair Competition

### 1.    Promissory Estoppel

The Eighth Count alleges that Compton and Garcia promised that they possessed "'Discount for Cash' technology and/or the I.P. required to develop the technology for CapX" and that plaintiffs reasonably relied on that promise in entering into the Business Services

---

[8] Moreover, at least as against the defendants who contracted with CapX, the Seventh Count is precluded by the contractual Agreements, which govern the parties' interactions with competitors and customers. See Target, 2017 WL 590316, at *9. Where, as here, the alleged wrongs committed by the plaintiffs are the subject of a claim for breach of contract, "New York law requires the claim to 'be determined by the contracts between the parties, not by courts or juries seeking after the fact to devise a code of conduct.'" Id. (quoting Carvel, 3 N.Y.3d at 193).

Agreement.  See Compl. ¶¶ 128-129; see id. ¶ 21.  Plaintiffs further allege that Compton and Garcia did not actually possess that technology.  See id. ¶ 130.

"In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made[;] and an injury sustained by the party asserting the estoppel by reason of the reliance." Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks and citations omitted).

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract"—including promissory estoppel—"for events arising out of the same subject matter." Villnave Constr. Servs., Inc. v Crossgates Mall Gen. Co. Newco, LLC, 161 N.Y.S.3d 480, 485 (3d Dep't 2022) (internal quotation marks, citation and alteration omitted); see Karmilowicz v. Hartford Fin. Servs. Grp., Inc., 494 F.App'x 153, 157-58 (2d Cir. 2012) (affirming dismissal of promissory estoppel claim); MatlinPatterson ATA Holdings LLC v. Fed. Express Corp., 929 N.Y.S.2d 571, 577-78 (1st Dep't 2011) (rejecting promissory estoppel claim because "a breach of contract claim may not give rise to tort liability unless a legal duty independent of the contract—i.e., one arising out of circumstances extraneous to, and not constituting elements of, the contract itself—has been violated.") (internal quotation marks and citation omitted).  Here, this Court has found that an enforceable agreement exists between CapX and ProfitSTAT that governs the same subject matter as plaintiffs' promissory estoppel claim.  See Business Services Agreement, DE #87-8 at ECF p. 10 (specifically providing that ProfitSTAT "shall develop and build the 'discount for cash' software").  To the extent that plaintiffs intended

their promissory estoppel claim to be pled in the alternative to their breach of contract claim, "if the court finds that a contract exists, the promissory estoppel claim must fall." M&B Props. 3 Bushey Lane VT, LLC v. CWCap. Asset Mgmt. LLC, 2:18-CV-4187 (PKC) (RER), 2019 WL 4805149, at *6 (E.D.N.Y. Sept. 30, 2019) (internal quotation marks and citation omitted).

Moreover, the Business Services Agreement contains an integration clause stating that it constitutes the "sole agreement of the parties and supersedes all oral negotiations and prior writings with respect to the subject matter hereof." Business Services Agreement ¶ 12(b). Because the integration clause "clearly states its superseding effect[,] . . . it would be unreasonable for [plaintiffs] to believe otherwise." ACIM NY, L.L.C. v. Nissan N. Am., Inc., 17 Civ. 729 (LGS), 2019 WL 935424, at *6 (S.D.N.Y. Feb. 26, 2019) (quoting Alfandary v. Nikko Asset Mgmt. Co., 337 F.Supp.3d 343, 359 (S.D.N.Y. 2018)). Accordingly, the integration clause likewise bars plaintiffs' claim for promissory estoppel, see ACIM NY, 2019 WL 935424, at *9; Target, 2017 WL 590316, at *8, even though Compton and Garcia were not parties to the Business Services Agreement, see ACIM NY, 2019 WL 935424, at *6 ("Under New York law, integration clauses can cover non-parties who function, for purposes of a transaction, as part of the same entity expressly covered by the integration clause."); Harmit Realties LLC v. 835 Ave. of the Americas, L.P., 23 N.Y.S.3d 230, 231 (1st Dep't 2016) (integration clause covering realty company extends to non-party acting as managing member of the firm).

2.    <u>Unjust Enrichment</u>

The Ninth Count alleges that Compton, Garcia and Benson "have been unjustly enriched by receiving and accepting payments from Plaintiffs despite breaching the terms of their respective contracts."  Compl. ¶ 133.

To maintain a cause of action for unjust enrichment under New York law, "a plaintiff must demonstrate that (1) the defendant was enriched; (2) at the plaintiff's expense; and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  <u>Ainbinder v. Money Ctr. Fin. Grp., Inc.</u>, No. CV 10–5270(SJF)(AKT), 2013 WL 1335997, at *8 (E.D.N.Y. Feb. 28, 2013), <u>adopted</u>, 2013 WL 1335893 (E.D.N.Y. Mar. 25, 2013).   However, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  <u>Target</u>, 2017 WL 590316, at *9 (quoting <u>Corsello v. Verizon N.Y., Inc.</u>, 18 N.Y.3d 777, 790 (2012)).

As with plaintiffs' promissory estoppel claim, plaintiffs' unjust enrichment claim is precluded by the existence of a written contract, which addresses the same subject matter.  <u>See Karmilowicz</u>, 494 F.App'x at 157-58 (affirming dismissal of unjust enrichment claim); <u>Ainbinder</u>, 2013 WL 1335997, at *8 (no unjust enrichment claim against contracting entity or CEO).  Moreover, the Ninth Count is precluded by the existence of a contract even though Compton and Garcia were not parties to the Business Services Agreement.  <u>See LaRoss Partners, LLC v. Contact 911 Inc.</u>, 874 F.Supp.2d 147, 165-66 (E.D.N.Y. 2012).

3.    Unfair Competition

The Tenth Count alleges that Compton, Garcia and Benson "used customer lists or customer information acquired from Plaintiffs" and thereby damaged plaintiffs.  See Compl. ¶¶ 138, 140-41.

"An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."  Fairfield Fin. Mortg. Grp., Inc. v. Luca, 584 F.Supp.2d 479, 487 (E.D.N.Y. 2008) (internal quotation marks and citation omitted); see Penrose Comput. Marketgroup, Inc. v. Camin, 682 F.Supp.2d 202, 214 (N.D.N.Y. 2010).  "Courts have found that the misappropriation of detailed, internal customer information can give rise to a claim of unfair competition, but only when that customer information has several of the attributes of a trade secret and is being used in breach of an agreement, confidence, or duty."  Penrose Comput. Marketgroup, 682 F.Supp.2d at 214 (quoting Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., Inc., 515 F.Supp.2d 298, 311 (N.D.N.Y. 2007)).  Moreover, even where the misappropriated information, such as client lists, does not rise to the level of a trade secret, it may form the basis for an unfair competition claim.  See Berman v. Sugo LLC, 580 F.Supp.2d 191, 209 (S.D.N.Y. 2008).[9]

Although plaintiffs' allegations regarding the confidentiality of its customer information are conclusory, see Compl. ¶ 139 ("The identities of or information about the customers used was not readily ascertainable outside Plaintiffs' business."), unfair competition claims

---

[9] Where the customer information does not qualify as a trade secret, wrongful conduct by the employee, such as physical taking or copying of the employer's files, can constitute unfair competition.  See Fairfield Fin. Mortg., 584 F.Supp.2d at 487; Paz Sys., Inc. v. Dakota Grp. Corp., 514 F.Supp.2d 402, 408 (E.D.N.Y. 2007).

involving the exploitation of customer lists are frequently sustained.  See N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999) (explaining that customer lists are protectible as trade secrets when the "list [is] developed by a business through substantial effort and kept in confidence[,] . . . provided the information it contains is not otherwise readily ascertainable"); Milton Abeles, Inc. v. Farmers Pride, Inc., 603 F.Supp.2d 500, 503 (E.D.N.Y. 2009) (Irizarry, J.) (holding that misappropriation of a confidential distribution list of customers and subdistributors may give rise to a claim of unfair competition); Berman, 580 F.Supp.2d at 209 (stating that an unfair competition claim may be based on the misappropriation of "client lists, internal company documents, and business strategies").  Further, the Business Services Agreement and the Consulting Agreement required ProfitSTAT and Benson, respectively, to keep confidential CapX's trade secrets or other information concerning its customers.  See Business Services Agreement ¶ 8(a)-(b), DE #87-8 at ECF p. 4; Consulting Agreement ¶ 13(b), DE #87-9 at ECF. p. 5.  Thus, as agents of CapX, the individual defendants were under a duty to protect its customer information, and their use of such information for their own benefit constitutes a breach of their duty.  See N. Atl. Instruments, 188 F.3d at 47-48.

Although plaintiffs' allegations are vague as to how Compton, Garcia and Benson "used" plaintiffs' customer information, other allegations in the Complaint suggest that the "use" of customer lists involved the individual defendants "working independently [] with merchants that were being referred to CapX[,]" Compl. ¶¶ 37, 79, and "sending CapX customers . . . to Bryte Payments, a competitor of CapX, in violation of their contractual agreements with CapX[,]" id. ¶ 74.  Plaintiffs thus have pled sufficient facts to support their claim that defendants engaged in unfair competition.

H.    **Contributory Infringement**

The Thirteenth Count alleges that ProfitSTAT, Compton and Garcia are liable for contributory trademark infringement in connection with CapX's trademark in the "WAVit" name.  See Compl. ¶¶ 153-156.

"To be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied."  Monbo v. Nathan, --F.Supp.3d--, 2022 WL 4591905, at *41 (E.D.N.Y. Aug. 26, 2022) (internal quotation marks and citation omitted); see Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 104 (2d Cir. 2010).  Although "it is not clear how the doctrine applies to people who do not actually manufacture or distribute the good that is ultimately palmed off as made by someone else[,]" Hard Rock Cafe Licensig Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1148 (7th Cir. 1992), courts have "extended the test to providers of services[,]" Tiffany (NJ) Inc., 600 F.3d at 104.

"Intentional inducement requires specific acts undertaken with knowledge of infringing behavior and with intent to cause infringement."  Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 206 F.Supp.3d 869, 905 (S.D.N.Y. 2016).  Here, the infringing conduct by MiCamp has been sufficiently pled: "MiCamp has been holding out the 'WAVit' mark as their own, in violation of CapX's trademark."  Compl. ¶ 86.  The Complaint does not, however, sufficiently allege defendants' inducement of the infringement by MiCamp.  Plaintiffs allege in general terms that Compton and Garcia oversaw MiCamp's development of the "discount for cash" technology, on behalf of CapX.  See id. ¶ 83 ("After entering into the ProfitSTAT

Agreement, Compton and Garcia sought out [MiCamp] to create the technology they had promised CapX."). Plaintiffs then simply restate the elements of the cause of action: "[d]efendants Compton and Garcia induced MiCamp to infringe on CapX's trademark of the WAVit name and supplied MiCamp with the means by which to infringe." Id. ¶ 155; see id. ¶ 87. The Complaint fails to allege any "specific acts" that ProfitSTAT, Compton or Garcia took to encourage the alleged infringement. Plaintiffs' conclusory allegations are insufficient to support defendants' liability for contributory infringement. See Ino, Inc. v. Needle & Threads of W. Palm Beach, Inc., 19-CV-4078 (PKC) (PK), 2020 WL 7343037, at *7 (E.D.N.Y. Dec. 14, 2020) (granting motion to dismiss contributory infringement claim for "offer[ing] only vague, conclusory statements" that amounted to "bare recitals of the elements" of a contributory infringement claim); Lopez v. Bonanza.com, Inc., 17 Civ. 8493 (LAP), 2019 WL 5199431, at *14 (S.D.N.Y. Sept. 30, 2019) (dismissing contributory infringement claim as conclusory where plaintiff did not allege "any specific acts" taken by defendants "to encourage the alleged infringement"); Gym Door Repairs, 206 F.Supp.3d at 905-06 (dismissing claim for contributory copyright infringement as insufficiently pled). Accordingly, this Court recommends dismissal of the Thirteenth Count, plaintiffs' claim for contributory infringement.

## III.   Damages

When assessing damages, a court cannot "just accept [the plaintiff's] statement of the damages." Transatlantic Marine, 109 F.3d at 111 (reversing default judgment that accepted plaintiff's unsubstantiated estimation of damages). Rather, damages must be established "with reasonable certainty." Id. It is within a court's discretion to determine whether the plaintiff's

burden of proving damages has been met, and whether to hold an evidentiary hearing.  See Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991).[10]

### A.   Lost Profits

Plaintiffs demand $125,562,207.00 in purported lost profits as compensatory damages. See Further Supplemental Affirmation in Support of Default Judgment (Nov. 18, 2022) ¶ 7, DE #92.[11]  Lost profits are potentially recoverable under New York law for breach of contract, breach of fiduciary duty and unfair competition.  See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007) (lost profits recoverable for breach of contract); Wealth Mgmt. Assocs. LLC v. Farrad, 17 Civ. 1924 (KPF), 2019 WL 6497424, at *3 (S.D.N.Y. Dec. 3, 2019) ("[O]n an unfair competition claim, plaintiff may recover . . . lost profits directly attributable to the wrongful act or profits earned by the defendant that are derived from unfair competition.") (internal quotation marks and citation omitted); Shamrock Power Sales, LLC v. Scherer, 12 Civ. 8959 (KMK)(JCM), 2016 WL 7647597, at *9 (S.D.N.Y. Dec. 8, 2016) (lost profits recoverable for breach of fiduciary duty claim), adopted, 2017 WL 57855 (S.D.N.Y. Jan. 4, 2017).  Nevertheless, "[i]n New York, the damages recoverable in tort actions cannot be contingent, uncertain, or speculative[.]"  New York Youth Club v. Town of Harrison, 12-CV-7534 (CS), 2016 WL 3676690, at *2 (S.D.N.Y. July

---

[10] Although plaintiffs in this case requested oral argument on their motion, see Letter (Nov. 18, 2022), DE #93, they failed to proffer a proper evidentiary basis on which to grant the damages they seek, despite having been afforded multiple opportunities to do so; in these circumstances, the Court concludes that if a hearing were scheduled, plaintiffs would simply cover the same ground as in their written submissions, and such a proceeding would be pointless.

[11] A "damages analysis report" prepared by a forensic accountant retained by plaintiffs (Sareena Sawhney) also quantifies the fees and reimbursed expenditures that CapX paid to defendants.  See Expert Report of Sareena Sawhney (docketed on Sept. 28, 2022) ("Sawhney Report") at 25-27, DE #87-3.  CapX's entitlement to forfeiture of those sums is discussed infra.

6, 2016) (quoting Wallace v. Suffolk Cnty. Police Dep't, 809 F.Supp.2d 73, 81 (E.D.N.Y. 2011)).  Likewise, in an action for breach of contract, a plaintiff can "recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty." Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000).  "Although lost profits need not be proven with 'mathematical precision,' they must be capable of measurement based upon known reliable factors without undue speculation.'" Id. (quoting Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403 (1993)).

Specifically, on a breach of contract claim, lost profits may be recovered as consequential damages only if: (1) lost profits were "fairly within the contemplation of the parties to the contract at the time it was made;" (2) lost profits were caused by the defendant's breach; and (3) such damages are "capable of proof with reasonable certainty." Kenford Co., Inc. v. Cnty. of Erie, 67 N.Y.2d 257, 261 (1986); see Carco Grp., Inc. v. Maconachy, 383 F.App'x 73, 75 (2d Cir. 2010); Tractebel Energy Mktg., 487 F.3d at 109. "[D]amages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." Kenford, 67 N.Y.2d at 261; see Toltec Fabrics, Inc. v. August Inc., 29 F.3d 778, 784 (2d Cir. 1994) (finding evidence of lost profits insufficient where there was no reasonable certainty of future sales); Trademark Rsch. Corp. v. Maxwell Online, Inc., 995 F.2d 326, 332–33 (2d Cir.1993) (finding no reasonable certainty of lost profits despite evidence of expert calculation of lost profits based on performance of comparable companies, market studies, business and promotional plans, subsequent sales, and earnings).

Here, plaintiffs fail to satisfy all three necessary elements to recover lost profits for breach of contract.  First, neither of the Agreements at issue makes any reference to lost profits, and plaintiffs have proffered no other evidence suggesting that the parties contemplated such damages.  See Healing Power, Inc. v. Ace Cont'l Exps., Ltd., No. 07-cv-4175 (NGG)(RLM), 2008 WL 4693246, at *8 (E.D.N.Y. Oct. 17, 2008) (adopting recommendation that request for lost profits be denied where "plaintiff presents no evidence that the lost profits were within the contemplation of the parties at the time of contract"); Spherenomics Glob. Contact Ctrs. v. vCustomer Corp., 427 F.Supp.2d 236, 252 (E.D.N.Y. 2006) (finding that parties did not contemplate lost profits liability where their written agreement was silent as to such damages).  On the contrary, in the case at bar, each Agreement provides that if defendant defaults in performance on the contract, CapX may terminate the contract.  See Business Services Agreement ¶ 4(b), DE #87-8 at ECF pp. 2-3; Consulting Agreement ¶ 5(c), DE #87-8 at ECF p. 3.

Second, plaintiffs fail to establish that their alleged lost profits were caused by defendants' breach of the respective contracts' provisions.  See Wealth Mgmt., 2019 WL 6497424, at *4 ("allegations do not establish with reasonable certainty that [defendant] caused Client [] to terminate his relationship with [p]laintiff").  For example, CapX's Chief Operating Officer merely asserts—without explanation, let alone substantiation—that CapX "believes [third-parties] would have been signed as clients if not for the Defendant's contract breaches and divergence of business."  Affidavit of Michael Gaspar (Sept 28, 2022) ("Gaspar Aff.") ¶ 9, DE #87-2 (emphasis added).  Plaintiffs' evidentiary submissions do not come close to establishing that, but for defendants' conduct, CapX would have obtained the lost business

claimed.  In other words, plaintiffs have not shown that defendants' disloyalty was the reason why CapX failed to secure those business opportunities.

In any event, lost profits under any legal theory of liability are often unrecoverable because such projections tend to be highly speculative and difficult to prove with reasonable certainty.  The obstacles to proving and recovering lost profits are particularly acute where, as here, the lost profits relate to a new and untested business with no history.   "[E]vidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate."  Schonfeld, 218 F.3d at 172.  As discussed below, plaintiffs' "evidence" of lost profits is based on projected sales and costs that are unsubstantiated and far too speculative to support a damages award of $125,562,207.  See Ho Myung Moolsan, Co. Ltd. v. Manitou Min. Water, Inc., No. 07 Civ. 07483(RJH), 2010 WL 4892646, at *7-8 (S.D.N.Y. Dec. 2, 2010) (excluding expert calculation of lost sales for new venture based on speculation, a series of assumptions lacking documentary support, and unreliable projections), aff'd, 501 F.App'x 85 (2d Cir. 2012).

In support of their claim for lost profits, plaintiffs submit a "damages analysis report" prepared by a forensic accountant, Sareena Sawhney.  See Sawhney Report, DE # 87-3.  The expert report, though replete with schedules, see Exhibits and Schedules, DE #87-4 at ECF pp. 1-64; Cash Flow Projection, DE #87-7 at ECF pp. 24-26, rests on various records that have not been furnished to the Court.[12]  Moreover, the expert's projections are not based on any

---

[12] For example, the Report identifies the "Blue Star Modelv3" as forming the basis for the expert's projections regarding lost customers and/or accounts, as well as costs to be deducted from revenues.  See Sawhney Report at 9-10 & n.6; id. at 12 nn.14, 15.  The report also relies on other documents that plaintiffs have not produced to the Court, such as the "CapX presentation to Blue Star," id. at 12 nn.14, 15, "CapX Model 1-9-17," id. at 17 n.35, and "Agenda for 2017 Call Today," id. at 17 n.34.

objective evidence such as actual sales or independent market research.  Instead, after acknowledging that plaintiffs "have no historical financial results" from which to project potential lost opportunities, the expert predicates her analysis primarily on "pre-litigation net profit *projections*" that she claims were prepared or reviewed by defendants while at CapX, see Sawhney Report at 9-10 (emphasis added), but that plaintiffs have not supplied to the Court.  To calculate monthly sales volume, the expert similarly relies on several (unproduced) documents that she attributes to defendants.  See id. at 17 nn.34-35.

Plaintiffs' failure to proffer the evidence underlying their expert's projections undermines their extravagant demand for lost profits.  Equally problematic is the absence of evidence establishing the reliability of the projections on which the expert based her damages calculations.  Plaintiffs and their expert simply assume that plaintiffs' burden of proving lost profits with reasonable certainty is discharged by using projections that they attribute to defendants.  See, e.g., id. at 10 n.6 (stating that defendants' "pre-litigation projection . . . was derived from the 'Blue Star Modelv3' (also prepared and reviewed by Defendants)"); id. at 17 n.34 ("Client has informed us the document was prepared by Compton."); id. at 17 n.35 ("The $10,000 monthly sales volume per merchant is an assumption used in the 'CapX Model 1-9-17' which was reviewed by Compton and Garcia.").  Even assuming *arguendo* that some or all defendants may have reviewed or had some "involvement" in preparing the referenced data or projections,[13] plaintiffs provide no proof of the reliability of those projections, which may well

---

[13] In seeking to link defendants to the "Blue Star" presentation, plaintiffs and their expert point to emails that show, at most, that Compton commented on the "Blue Star Deck."  See Sawhney Report at 10, 12, 13, 17; 11/7/16 email from Paul Compton, DE #87-4 at ECF p. 65; 11/7/16 email from Paul Compton, DE #87-4 at ECF p. 75.  Similarly, the expert's projections incorporate a specific revenue rate that was allegedly "reviewed by Paul Compton and Pablo Garcia in an email[.]"  Detail Summary Projected Net Profits, DE #87-4 at ECF p. 10 n.a. The referenced email neither recites the revenue rate nor reflects that Compton or Garcia reviewed or approved such a rate.  See 1/16/17 email from Michael Gaspar, DE #87-7 at ECF p. 1.

have been the product of unwarranted optimism and/or outright exaggeration.  See Ho Myung Moolsan, 2010 WL 4892646, at *8 (characterizing expert report regarding lost profits as "nothing more than . . . [m]y client tells me I can sell three million bottles and get fifteen dollars a bottle.").  Nor do plaintiffs provide support for their reliance on performance by supposedly "comparable companies" for their profit projections.  See Sawhney Report at 10.  Plaintiffs' submissions "fail[] to establish the high degree of correlation" between CapX and the proffered comparators "upon which the probative quality of this evidence depends." Schonfeld, 218 F.3d at 174.

Simply put, in order to grant plaintiffs the lost damages award that they seek, the Court would have to accept at face value plaintiffs' unsubstantiated assumptions regarding their projected sales, expenses and profits.  But such "[p]rojections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty."  Schonfeld, 218 F.3d at 172 (internal quotation marks and citation omitted); see Lenard v. Design Studio, 889 F.Supp.2d 518, 536 (S.D.N.Y. 2012) (on default judgment, denying damages for lost profits where plaintiff's calculations rested on speculative assumptions); Summit Props. Int'l, LLC v. Ladies Pro. Golf Ass'n, No. 07 Civ. 10407(LBS), 2010 WL 2382405, at *4 (S.D.N.Y. June 14, 2010) ("Summit has not offered any evidence that suggests that the Projections or, more generally, the existence of lost profits is anything more than merely speculative."); Millenium Expressions, Inc. v. Chauss Mktg., Ltd., No. 02 Civ. 7545(JCF), 2007 WL 950070, at *7 (S.D.N.Y. Mar. 30, 2007) ("Any award of lost profits here would be entirely speculative.").   This Court therefore recommends that plaintiffs' demand for lost profits be denied.  See, e.g., Variblend Dual Dispensing Sys.,

2022 WL 17156550, at *11 (granting summary judgment dismissing plaintiff's lost profits theory where plaintiff "cannot point to record evidence that would allow a reasonable jury to calculate its purported lost profits to a reasonable certainty"); Billion Tower Int'l, LLC v. MDCT Corp., No. 08 Civ. 4185(LAK)(JLC), 2010 WL 5536513, at *9 (S.D.N.Y. Dec. 10, 2010) (recommending denial of lost profits where plaintiffs proffered no basis for their historical sales and profit data), adopted, 2011 WL 43458 (S.D.N.Y. Jan. 6, 2011); Ho Myung Moolsan, 2010 WL 4892646, at *8 (rejecting expert opinion absent "documentary evidence attesting to the Report's reliability"); Homkow v. Musika Records, Inc., No. 04 Civ. 3587(KMW)(THK), 2009 WL 721732, at *10-12 (S.D.N.Y. Mar. 18, 2009) (on default judgment motion, finding that plaintiff's lost profit calculations were "fundamentally flawed" in that affidavit from industry expert "provided no sound basis" for projected sales figures and calculation of costs); ATC Healthcare Servs., Inc. v. Personnel Sols., Inc., No. 01 CV 762 CBA, 2006 WL 3758618, at *8 (E.D.N.Y. Dec. 19, 2006) ("plaintiff has failed to submit documentation estimating [] lost profits with reasonable certainty"); Int'l Telecom, Inc. v. Generadora Electrica Del Oriente, S.A., No. 00Civ.8695(WHP)(KNF), 2004 WL 784941, at *4 (S.D.N.Y. Apr. 13, 2004) (in default context, declining to award plaintiff future lost profits: "Although [plaintiff's] documentation of its two months of profits is thorough, it nevertheless fails to meet the requirement of reasonable certainty because it rests on a host of speculative assumptions and few known figures.") (internal quotation marks and citation omitted).

In sum, despite the Court's repeated directions to plaintiffs to produce adequate legal and factual bases for their damages demand, plaintiffs have provided neither. As they thus

have not satisfied their burden of demonstrating their lost profit damages to a reasonable

certainty, they are not entitled to an award of such damages.

### B.      Forfeiture of Amounts Paid

In the alternative, plaintiffs proffer a more modest measure of damages: reimbursement

of the amounts paid to Compton, Garcia and Benson.  See Sawhney Report at 26-27; see also

Affidavit of Andrew Siden (Sept. 28, 2022) ¶ 9, DE #87-1; Gaspar Aff. ¶ 10 (stating that the

Sawhney Report outlines the financial losses attributable to defendants' acts and omissions).

Plaintiffs allege that pursuant to the Business Services Agreement, ProfitSTAT was obligated

to use best efforts to introduce prospective merchants to CapX's merchant processing services

and programs, facilitate such merchants' submission of applications for merchant processing

services with CapX, promote CapX's merchant processing services and programs, and develop

and build the "discount for cash" software.  See Compl. ¶ 23; see also Business Services

Agreement, DE #87-8 at ECF p. 10.  Because plaintiffs have adequately alleged a claim by

CapX for breach of contract against ProfitSTAT and Benson, and for breach of fiduciary duty

against Compton, Garcia and Benson, CapX may be awarded damages for those breaches,

provided the amounts have been substantiated.

With respect to the breach of contract claims, it is well established that "a party's

performance under a contract is excused where the other party has substantially failed to

perform its side of the bargain[.]"  Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500

F.3d 171, 186 (2d Cir. 2007).  Where, as here, the breaching parties (defendants) received

payments from the non-breaching party (plaintiff), the plaintiff is entitled to general or

compensatory damages representing the amounts plaintiff paid to defendants with the

expectation that they would fulfill their contractual obligations.  See Homkow, 2009 WL 721732, at *9.  Thus, CapX is entitled to general contract damages in the amounts paid to defendants for services to be performed pursuant to the Agreements.

Similarly, as a measure of compensatory damages for defendants' breaches of fiduciary duty, CapX is entitled to recover the compensation paid to defendants for the work they were supposed to have performed.[14]  See, e.g., City of Binghamton v. Whalen, 32 N.Y.S.3d 727, 730 (3d Dep't 2016) (explaining that, under "New York's strict application of the forfeiture doctrine," the "amount of damages" for the plaintiff's "action sounding in breach of fiduciary duty" is the amount plaintiff "paid defendant . . . in compensation").  The breaching fiduciary's forfeiture of the compensation received is not contingent upon the principal's proof that it suffered a particular loss.  See Beach v. Touradji Cap. Mgmt., LP, 42 N.Y.S.3d 96, 102 (1st Dep't 2016) (explaining that, on a breach of fiduciary duty claim, the principal's "damages are not limited to" a particular loss because the principal "could seek to recover the compensation it paid to" the servants); see also Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 242 (2d Cir. 2020) (recognizing that "many courts" do not "distinguish" between breach of fiduciary duty claims and the faithless servant doctrine and "some even note that they are essentially the same").  Indeed, the Second Circuit has recognized that "an action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach— not simply to compensate for damages in the event of a breach."  Yukos Cap., 977 F.3d at 241-42 (internal quotation marks and citation omitted).  "Thus, where an employee engage[s] in repeated acts

---

[14] Although plaintiffs allege breaches of contract and fiduciary duties, "plaintiff[s] seeking compensation for the same injury under different legal theories [are] of course only entitled to one recovery."  Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995).

of disloyalty, complete and permanent forfeiture of compensation, deferred or otherwise, is warranted." City of Binghamton, 32 N.Y.S.3d at 728 (internal quotation marks and citations omitted). "[F]orfeiture of compensation is required even when some or all of the services were beneficial to the principal or [when] the principal suffered no provable damage as a result of the breach of fidelity by the agent." Id. at 729 (internal quotation marks and citation omitted).

Here, forfeiture is an appropriate remedy for defendants' breach of their fiduciary duties. First, forfeiture is warranted because defendants acted "adversely" to CapX in violation of the Agreements and their duties to CapX. According to the Complaint, defendants worked independently with merchants and/or ISOs and engaged in efforts to divert these potential clients and/or ISOs away from CapX for their own benefit, while using CapX's reputation and financial resources; moreover, prior to CapX entering into an agreement with SplitIT North America, defendants failed to disclose that Compton, Garcia and Benson were employed by SplitIT North America. See Compl. ¶¶ 37-38, 62-63. Based on the aforesaid allegations, forfeiture is warranted because defendants committed substantial violations of the Agreements by their misconduct and unfaithfulness. Furthermore, the Complaint suggests that defendants' acts of disloyalty continued throughout the terms of the Agreements. Accordingly, defendants should be required to forfeit their total compensation.

The Sawhney Report details the amounts paid by CapX to each of the defendants as fees and reimbursed expenditures in connection with their services under the Agreements. See Sawhney Report at 25-27. With respect to ProfitSTAT, the expert report reflects that ProfitSTAT was paid a flat fee of $35,000 per month from November 2016 through April

2017, for a total of $210,000, plus advances against future commissions in the amount of $25,000 per month from May 2017 through August 2017, for an additional $100,000.  See id. at 26; Detailed Summary of Payments Made to ProfitSTAT ("ProfitSTAT Payment Summary"), DE #87-4 at ECF p. 62; see also Business Services Agreement ¶ 2, DE #87-8 at ECF p. 2 (specifying that the fees due to ProfitSTAT are "consideration for the Services to be provided").  In addition, CapX reimbursed ProfitSTAT for expenses in the amount of $219,462.08, for which plaintiffs now claim that ProfitSTAT falsified its expense reimbursement reports.  See Sawhney Report at 27; ProfitSTAT Payment Summary at ECF p. 62.  Thus, the total amount that CapX is alleged to have paid to ProfitSTAT—and, indirectly, to its owners, Garcia and Compton—was $529,462.

Similarly, in consideration for the services to be provided by defendant Benson pursuant to the Consulting Agreement, CapX agreed to pay a monthly fee of $6,250 per month (the first month was to be prorated).  See Consulting Agreement ¶ 2, DE #87-9 at ECF p. 2. Accordingly, CapX paid Benson a total of $58,437.50 in fees from March 2017 through December 2017.  See Sawhney Report at 27; Detailed Summary of Payments Made to Benson ("Benson Payment Summary"), DE #87-4 at ECF p. 63.  In addition, CapX reimbursed Benson's allegedly falsified expenses in the amount of $6,878.25 during the period May 2017 through July 2017.  See Sawhney Report at 27; Benson Payment Summary, DE #87-4 at ECF p. 63.  The total amount alleged to have been paid to Benson is thus $65,316.

Had plaintiffs produced the underlying documents substantiating the payments outlined in the Sawhney Report and accompanying summaries of payments, this Court would have recommended that CapX be awarded damages in the amount of $529,462 against ProfitSTAT,

Compton and Garcia, jointly and severally, and $65,316 against Benson.  Unfortunately, despite a directive from the Court to submit documents relevant to their damages demand, see 9/6/22 Order at 2, plaintiffs failed to do so, relying instead on their expert's summary of the contents of those materials.  While the Court would thus be entitled to recommend that plaintiffs be awarded no damages, see U.S. Bank Nat'l Ass'n as Tr. for RMAC Tr., Series 2016-CTT v. Kozikowski, 19-CV-00783 (DLI) (CLP), 2022 WL 4596753, at *7-8 (E.D.N.Y. Sept. 30, 2022) (declining to award damages on default, on account of insufficient substantiation and documentation) (Irizarry, J.); BASF, 2022 WL 704127, at *8 (denying request for damages for equipment loaned to defendant in the absence of supporting documentation), the Court instead recommends that CapX be afforded one final opportunity to substantiate its calculation of the amounts it paid to defendants for compensation and reimbursed expenses.

### C.    Prejudgment Interest

In New York, a prevailing party on a claim for breach of contract or breach of fiduciary duty is entitled to prejudgment interest.  See J. Barrows, Inc. v. Uvino, 514 F.App'x 23 (2d Cir. 2013) (citing N.Y. C.P.L.R. § 5001(a)).  In this case, it would be premature to grant prejudgment interest, as the calculation of the amount to be awarded CapX as forfeiture of funds paid to defendants should await the submission by CapX of the underlying records reflecting those payments.  Moreover, the Court has not been furnished with adequate documentation from which to calculate prejudgment interest.  See J. Kings Food Serv. Pro., Inc. v. Navin Bros. Food Serv., Inc., 17-cv-5472 (JFB)(SIL), 2018 WL 4443130, at *4 n.5 (E.D.N.Y. Aug. 15, 2018), adopted, 2018 WL 4409837 (E.D.N.Y. Sept. 13, 2018).

Accordingly, the Court recommends that CapX be granted leave to submit a supplemental declaration attaching the requisite documents and setting forth CapX's calculations of prejudgment interest.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that the motion of plaintiff PPV Merchant Solutions, LLC (d/b/a CapX) for default judgment against defendants ProfitSTAT, LLC, Paul Compton and Pablo Garcia, jointly and severally, be granted with respect to liability on the First (ProfitSTAT, LLC), Third (Compton and Garcia) and Tenth Counts (Compton and Garcia), respectively, and that CapX's motion for default judgment against defendant Christopher Benson be granted with respect to liability on the Second (Benson), Third (Compton, Garcia and Benson) and Tenth Counts (Compton, Garcia and Benson).  The Court further recommends that the claims brought by plaintiffs Prepaid Ventures, Ltd. and PPV Holdings, LLC be dismissed, along with the claims brought by CapX on the Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Thirteenth Counts.  It is additionally recommended that plaintiffs' demand for lost profit damages be denied as unduly speculative.  Finally, the Court recommends that CapX be granted leave to submit the documentation substantiating payments made to ProfitSTAT, Compton, Garcia and Benson, along with a supplemental declaration quantifying prejudgment interest on the same.

Any objections to the recommendations contained herein must be filed with Judge Irizarry on or before January 9, 2023.  Failure to file objections in a timely manner may waive

a right to appeal the District Court order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a),

6(d), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per

curiam).

      **SO ORDERED.**

**Dated:**    **Brooklyn, New York**
             **December 21, 2022**

                /s/      *Roanne L. Mann*
                **ROANNE L. MANN**
                **UNITED STATES MAGISTRATE JUDGE**